**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| JAMES SCOTT, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-04179-NKL |
| | ) | |
| COWLEY DISTRIBUTING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER**

Plaintiff James Scott, Sr. brings this suit *pro se* against his employer, Defendant Cowley Distributing, Inc, alleging that during the course of his employment he has been discriminated against on the basis of race and religion, subjected to a racially hostile work environment, denied promotional opportunities, and subsequently retaliated against for his complaints. Pending before the Court is Defendant's Motion for Summary Judgment, Doc. 69, and Plaintiff's Motion for Leave to File Sur-Reply, Doc. 73. For the following reasons, the Motion for Summary Judgment is granted in part and denied in part, and the Motion for Leave to File Sur-Reply is denied.

## I.   UNDISPUTED FACTS[1]

Defendant Cowley Distributing, Inc. is a wholesale distributer of magazines and books based in Jefferson City, Missouri. Doc. 70-3, p. 1. Cowley employs over 500 individuals and services more than 3,900 retail outlets in eight states: Kansas, Nebraska, Missouri, Oklahoma, Arkansas, Illinois, Tennessee, and Mississippi. *Id.* Plaintiff James Scott, Sr. is an African-

---

[1]      In ruling on a motion for summary judgment, the Court must view all facts in a light most favorable to the nonmoving party, and that party receives the benefit of all reasonable inferences drawn from the facts. *Robinson v. Monaghan*, 864 F.2d 622, 624 (8th Cir. 1989).

American Cowley employee, and a Jehovah's Witness.  Doc. 71, p. 4.

Mr. Scott was initially hired as a delivery driver by a different company—Anderson News—in April 2004.  Doc. 71-7, p. 24.  As he is a Jehovah's Witness, Anderson News agreed not to require Mr. Scott to touch any pornographic material, and allowed him to take one day off every year to attend a religious convention.  *Id.*  In 2009, Cowley purchased the assets of Anderson News, and hired Mr. Scott to continue working as a delivery driver.  Doc. 70-3, p. 1.  That same year, Cowley did not permit Mr. Scott to take the day off to attend his religious convention.  Doc. 71-7, p. 24-25.  Mr. Scott subsequently filed an EEOC complaint, but dropped the charge after coming to an agreement with Cowley, whereby Cowley agreed to allow Mr. Scott to take the first week of June off work every year so that he could attend his religious convention.  Doc. 70-3, p. 2.  Mr. Scott also agreed to give Cowley two weeks' notice if the date of the convention ever changed.  *Id.*

Shortly after reaching their agreement, Cowley began requiring Mr. Scott to deliver pornographic materials.  Doc. 71-7, p. 26.  Mr. Scott raised the issue with his supervisor, but was not allowed to change his route.  *Id.*  Mr. Scott then asked a fellow driver to deliver his pornographic material for him, and the co-worker agreed.  *Id.*  Although Mr. Scott sought the accommodation himself, Cowley permitted the change, and since that time, Mr. Scott has not been required to deliver any materials that he considers offensive.  Doc. 71, p. 13.

In 2014, an incident occurred in which one of Cowley's employees made racially insensitive social media posts.  Doc. 70, p. 3.  Although all of the posts were made from the employee's personal devices and outside of working hours, the employee responsible for the posts was terminated.  *Id.*  Mr. Scott did not learn of the incident until years later, and never filed a formal complaint or formal grievance upon learning of the incident.  *Id.*

In January 2016, the GPS device located in Mr. Scott's company vehicle sent out twenty-one "tamper alerts." Doc. 71, p. 13.[2] Mr. Scott admits that the tamper alerts resulted from him removing the GPS from his vehicle after work, and then putting it back before work. *Id.* As a result of the alerts, Cowley secured Mr. Scott's GPS device to his company vehicle with a zip-tie, to prevent future tampering. *Id.*

On March 23, 2016, Mr. Scott used a company vehicle during work hours to attend a religious memorial observation. *Id.* Company policy dictates that employees are not permitted to use company vehicles for personal use during work hours without permission. Doc. 70-3, p. 2. Mr. Scott received a written warning (a "write-up") for violating company policy, and for failing to follow his route guide. Doc. 71-1, pp. 5-7.

In May 2016, Mr. Scott began writing letters to Cowley's CEO and President, John Cowley, complaining of what he felt was unfair treatment by his supervisors, racism in the workplace, and seeking to discuss the issues with Mr. Cowley. Doc. 71-2, pp. 29-48; Doc. 71-3, pp. 1-22. Mr. Scott sent Mr. Cowley a letter on May 6, 2016, June 13, 2016, August 31, 2016, November 17, 2017, and January 12, 2018. *Id.*

Between July and October 2017, Mr. Scott received three more write-ups.[3] On July 31, 2017, Mr. Scott received a write-up because a "Golden spinner rack" at one of his retail stores was almost empty, and because a paperback bestseller rack was a "little low" and had "holes on the bottom for more books." Doc. 71-5, p. 26. On October 11, 2017 and on October 18, 2017, Mr.

---

[2]    Defendant installs NexTraq GPS devices in all of its vehicles as a safety feature because of a fatal motor vehicle accident involving one of its drivers. Doc. 71, p. 13.

[3]    These three write-ups occurred after this case was initiated. Mr. Scott relies heavily on the three additional write-ups in his opposition to this motion, and Cowley has not raised any objection. Moreover, Cowley expressly acknowledged the additional write-ups in its Reply brief. Doc. 72, p. 9. While Cowley admits that the write-ups occurred, it only denied that the incidents altered Mr. Scott's conditions of employment. Accordingly, the Court will consider all four write-ups in ruling on this motion.

Scott was written up for not following his delivery schedule.  Doc. 71-6, pp. 2, 12.  According to the write-ups, Mr. Scott was making deliveries on Wednesdays, which is not a scheduled delivery day.  *Id.*

Mr. Scott originally filed this lawsuit against Cowley in the United States District Court for the District of Kansas on December 23, 2016.  On September 20, 2017, Chief District Judge Julie A. Robinson of the District of Kansas granted Mr. Scott leave to amend his Complaint, and granted Cowley's motion to transfer venue.  The case was subsequently transferred to this Court on September 21, 2017.  Mr. Scott's Amended Complaint, Doc. 38, raises the following five counts:

- **Count I:** Race Discrimination in Terms and Conditions of Employment, pursuant to Title VII and Section 1981
- **Count II:** Racially Hostile Work Environment, pursuant to Title VII and Section 1981
- **Count III:** Denial of Promotional Opportunities Based on Race, pursuant to Title VII and Section 1981
- **Count IV:** Religious Discrimination, Pursuant to Title VII
- **Count V:** Retaliation, Pursuant to Title VII and Section 1981

Cowley moves for summary judgment on all five counts.

## II.  SUMMARY JUDGMENT STANDARDS

"Summary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."  *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011).  While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), "[t]he party opposing summary judgment cannot rest solely on the pleadings, but instead must set forth specific facts showing there is a genuine issue of material fact for trial."  *Thomas v. Corwin*, 483 F.3d 516, 526 (8th Cir. 2007).  Furthermore, "mere allegations, unsupported by specific facts or

evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Id.* "[W]here the evidence is such that no reasonable jury could return a verdict for the non-moving party," summary judgment is appropriate. *Smith v. Basin Park Hotel, Inc.*, 350 F.3d 810, 813 (8th Cir. 2003).

## III. DISCUSSION

### A. Discrimination Claims

To survive Cowley's motion for summary judgment on his discrimination claims, Mr. Scott must either present direct evidence of discrimination, or satisfy the *McDonnell Douglas* burden-shifting scheme. *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1196 (8th Cir. 2006) (explaining that "the *McDonnell Douglas* burden-shifting framework governs claims of race discrimination under Title VII and Section 1981"); *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881, 887 (8th Cir. 2015) (applying *McDonnell Douglas* framework to Title VII religious discrimination claims). Because Mr. Scott has not offered any direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework governs. Under the *McDonnell Douglas* burden-shifting framework, Mr. Scott must first demonstrate a prima facie case of discrimination; then the burden shifts to Cowley to articulate a legitimate, non-discriminatory reason for the challenged action; finally, if Cowley offers such a reason, then the burden shifts back to Mr. Scott to show that the proffered reason is merely a pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S.792, 803 (1973); *see also Gordon*, 469 F.3d at 1196; *Shirrell*, 793 F.3d at 887.

#### 1. Count I: Racial Discrimination

Mr. Scott's claim in Count I alleges disparate treatment in violation of Title VII and § 1981. To establish a prima facie case of disparate treatment under either statute, a plaintiff must show that "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3)

he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination . . . ." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (§ 1981); *Tolen v. Ashcroft*, 377 F.3d 879, 882 (8th Cir. 2004) (Title VII). Cowley argues that it is entitled to summary judgment because Mr. Scott cannot establish the third or fourth elements of a prima facie case. Cowley also argues that it had a legitimate non-discriminatory reason for every action it took.

### a.    Did Mr. Scott Suffer an Adverse Employment Action?

An adverse employment action "is a tangible change in working conditions that produces a material employment disadvantage." *Clegg v. Arkansas Dep't of Correction*, 496 F.3d 922, 926 (8th Cir. 2007) (quoting *Thomas v. Corwin*, 483 F.3d 516, 528 (8th Cir. 2007)). This might include "termination, cuts in pay or benefits, and changes that affect an employee's future career prospects." *Id.* (quoting *Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir. 2007)). "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Id.* Actions that are less than demotion, suspension, or termination, however, may be adverse employment actions "if their cumulative effect causes an employee to suffer 'serious employment consequences' that adversely affect or undermine h[er] position.'" *Wagner v. Campbell*, 779 F.3d 761, 767 (8th Cir. 2015).

Mr. Scott bases his disparate treatment claim on the placement of a zip-tie around the GPS tracking device in his company vehicle, and on four write-ups that Cowley issued to him.

The zip-tie used to secure the GPS device in Mr. Scott's company vehicle does not constitute an adverse employment action. "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Wagner*, 779 F.3d at 766 (quoting *Duffy v. McPhillips*, 276 F.3d

988, 991–92 (8th Cir. 2002)).  Rather, Mr. Scott must establish that "a reasonable employee would have found [the zip-tie] *materially* adverse."  *Id.* (quoting *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1130 (8th Cir. 2014)) (emphasis in original).  No reasonable employee would find a common zip-tie to be materially adverse to their employment—especially considering the zip-tie was only installed after Mr. Scott created twenty-one tamper alerts.

With regard to the write-ups, Cowley argues that they do not constitute adverse employment actions because they were not accompanied by any reduction in pay or benefits.  In support, Cowley cites to *Wagner v. Campbell*, which states that "a reprimand is an adverse employment action only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse."  779 F.3d at 767.  In *Wagner*, an employee received a written reprimand for not following an office policy.  *Id.* at 764.  The reprimand remained in the employee's file for one year and required that she comply with her supervisor's directions.  *Id.*  It did not result in any pay reduction or loss of benefits.  *Id.*  The Eighth Circuit held that, considering the lack of real repercussions, this written reprimand did not rise to the level of an adverse employment action.  *Id.*

The present matter is distinguishable in an important way.  Whereas there were no other repercussions to the employee in *Wagner* as a result of her reprimand, here, as long as Mr. Scott has the write-up in his file, he is ineligible to apply for a promotion.  *See* Doc. 71-7, p. 22 ("[E]mployees who have a written warning on file, or are on probation or suspension are not eligible to apply for posted jobs.").  Thus, in addition to constituting warnings, it is indisputable that the write-ups negatively affect Mr. Scott's future career prospects.  *See Clegg*, 496 F.3d at 926 (explaining that an adverse employment action might include "changes that affect an employee's future career prospects").

Cowley argues that the effect on Mr. Scott's future promotional opportunities is insignificant because no opportunities for promotion were available at the time of his write-ups, and because he never applied for any promotions before he received the write-ups. These arguments are unavailing. Whether there were any opportunities available at the time of the write-ups does not alter the fact that, should an opportunity arise, Mr. Scott is now ineligible. Cowley offers no counter argument to Mr. Scott's assertion that he is ineligible for promotion, nor any indication that Mr. Scott may become eligible again for promotion in the future.

When faced with similar circumstances, in *Gagnon v. Sprint Corp.*, the Eighth Circuit commented, in dicta, that a plaintiff's allegations that a reprimand "resulted in the outright closing of job openings to him and the loss of opportunity to compete for any position," might constitute an adverse employment action. 284 F.3d 839, 851 (8th Cir. 2002). Therefore, the Court finds that by issuing write-ups to Mr. Scott that essentially deny him any opportunity for advancement, Cowley has negatively impacted his future career prospects in a materially adverse way, which is a sufficiently adverse employment action to support Mr. Scott's prima facie case.

### b.      Is there an Inference of Discrimination?

Circumstances giving rise to an inference of discrimination include "treating similarly situated employees outside the protected class . . . differently." *Young*, 754 F.3d at 577.

Mr. Scott has received four write-ups, which the Court has found to be adverse employment actions. On March 31, 2016, he received a write-up for using his company vehicle for personal use—he attended a religious event during work hours—and failing to follow his route guide. Doc. 71-1, pp. 5-7. On July 31, 2017, Mr. Scott received a write-up because a "Golden spinner rack" at one of his retail stores was almost empty, and because a paperback bestseller rack was a little low and had holes on the bottom. Doc. 71-5, p. 26. On October 11, 2017 and on October 18,

2017, Mr. Scott received a write-up for not following his delivery schedule. Doc. 71-6, pp. 2, 12. According to the write-ups, Mr. Scott was making deliveries on Wednesdays, which is not a scheduled day. *Id.*

Cowley argues that Mr. Scott is unable to establish an inference of discrimination related to any of the write-ups. Cowley relies on Mr. Scott's deposition, where he stated that he was unaware of anyone else—regardless of race or religion—who could use their company vehicle for personal use. Doc. 70-1, p. 26. Mr. Scott has failed to present any evidence that rebuts his own deposition testimony, and therefore there is no inference of discrimination related to his March 31, 2016 write-up. However, Mr. Scott has presented evidence of a similarly situated Caucasian employee who was treated differently when it comes to Mr. Scott's other write-ups.

Mr. Scott presents the declaration of Brian John, a Caucasian delivery driver who also works for Cowley. Mr. John states that in September 2017, his supervisor, Gerald O'Guinn, checked his Golden spinner rack and found it to have holes, just as Mr. Scott's did. Rather than issue a write-up to Mr. John, Mr. O'Guinn ordered the books that were necessary for Mr. John to fill the rack. Doc. 71-8. Mr. Scott also presents the declaration of Greg Blankenship, another Caucasian delivery driver. Mr. Blankenship states that he has worked on some Wednesday's "to get [his] work caught up," but has never received a write-up. Mr. Blankenship also states that his schedule has only ever included a four day work week, the same as Mr. Scott's. Doc. 71-8, p. 14. By virtue of Mr. John and Mr. Blankenship's declarations, Mr. Scott has presented evidence that the same conduct for which he received write-ups—a Golden books spinner rack that was missing books, and working on a Wednesday—have not resulted in write-ups for similarly situated Caucasian employees.

Cowley argues that the Court should not consider the declarations of Mr. John or Mr.

Blankenship, because they offer unsubstantiated opinions and conclusory statements, and argues generally that they "are not supported by personal knowledge." Doc. 72, p. 9. Cowley argues the declarations should be stricken pursuant to Fed. R. Civ. P. 56(c)(4). However, the statements in Mr. John and Mr. Blankenship's declarations are clearly based on personal knowledge of their own employment at Cowley. Their declarations provide a recitation of specific facts demonstrating that they are Caucasian employees who did not receive write-ups for engaging in the same conduct for which Mr. Scott received write-ups. They are neither opinions nor conclusory.

Cowley also argues that Mr. Scott's additional facts should not be considered because he failed to set out a separate section of his own additional uncontroverted facts. To the extent Cowley seeks to exclude all of Mr. Scott's additional facts, the Court finds that such an outcome would be unduly prejudicial to Mr. Scott, as a pro se plaintiff. Furthermore, he attempted to comply with the local rules and indeed included a section of additional uncontroverted facts. While Cowley argues that attempting to find Mr. Scott's new facts within his brief is akin to "search[ing] for a needle in a haystack," Doc. 72, p. 8, this is no basis to strike Mr. Scott's exhibits. The facts contained in the exhibits—especially the declarations—are clear, and Cowley had a fair opportunity to contest them. That Mr. Scott's additional fact section is imperfect does not warrant the extreme penalty of striking all of Mr. Scott's declarations. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be liberally construed,' . . . and 'must be held to less stringent standards than formal pleadings drafted by lawyers.'").

Therefore, the Court will consider the declarations of Mr. John and Mr. Blankenship. Accordingly, there is sufficient evidence in the record to give rise to an inference that Mr. Scott was written up for discriminatory reasons.

### c.     Did Cowley have a Legitimate, Non-Discriminatory Reason?

Cowley argues that it had a legitimate, non-discriminatory reason to issue Mr. Scott's write-ups—he indisputably violated company policy. While this may be true, it is an insufficient reason to shift the burden back to Mr. Scott in this case, because the question in this case is whether Cowley disparately applied its company policies based on race. Mr. Scott's claim is that he was treated differently than similarly situated employees *who also violated the same company policy*.[4] Moreover, even if violating the company policy was a legitimate, non-discriminatory reason for their actions, Mr. Scott has naturally presented evidence of pretext via the same evidence that he uses to establish an inference of discrimination. That is, Caucasians who violated the same policy as Mr. Scott were not written up.

Therefore, Cowley's motion for summary judgment on Count I: race discrimination, is denied.

### 2.     Count IV: Religious Discrimination

To establish a prima facie case of religious discrimination under Title VII requires essentially the same showing as a racial discrimination claim. A plaintiff must show that: "(1) [he] is a member of a protected class because of his religious beliefs, (2) [he] met [his] employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." *Shirrell*, 793 F.3d at 887.

Mr. Scott alleges two specific instances of religious discrimination: first, that Cowley required him to deliver pornographic materials he considered to be offensive, in violation of his beliefs as a Jehovah's Witness, and second, that Cowley issued him a write-up for using his work vehicle to attend a religious event, despite the parties' settlement agreement. Once again, Cowley

---

[4]     The Court is also wary of the fact that Cowley has not submitted any evidence of the company policies, other than the affidavit of its CEO and President, John Cowley.

argues that summary judgment is appropriate because Mr. Scott cannot establish the third and fourth elements of this cause of action.

With regard to Mr. Scott's first allegation—that he was required to deliver offensive pornographic material—his claim fails because he received an accommodation. While Plaintiff asserts that he was not accommodated by Cowley and had to make arrangements himself with another driver, such a distinction is immaterial. Mr. Scott was permitted to switch routes with another driver to avoid delivering offensive materials. Since this switch, Mr. Scott has not been required to deliver any material he considers offensive. Doc. 71, p. 13. Such an accommodation, which eliminates Mr. Scott's religious conflict, does not give rise to an inference of discrimination. *See Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1031 (8th Cir. 2008) ("an accommodation is reasonable as a matter of law if it eliminates a religious conflict") (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 71 (1986)).

Turning next to Mr. Scott's write-up for using a company vehicle to attend a religious event during the work day, Mr. Scott again fails to identify circumstances giving rise to an inference of discrimination. Mr. Scott identifies no similarly situated co-workers who were permitted to drive their company vehicle for personal use during the work day without obtaining prior permission. His assertion that Cowley "has no problem with [employees] using the vans to make quick grocery stops or things of that nature," Doc. 71, p. 49, is factually unsupported, and contradictory to his sworn testimony. Doc. 70-1, p. 110 ("Q. And you're not able to identify any similarly situated employees not of your religion who were able to attend personal religious events during work time using a work vehicle? A. Right.").

Mr. Scott also provides no evidence that the religious nature of the event he attended was the basis of his reprimand, rather than his violation of company policy. Mr. Scott does not dispute

Cowley's assertion that it is a violation of company policy to use a company vehicle for personal use without permission during work hours. Rather, Mr. Scott asserts that his Division Manager "understood" that there was no need to give notice to attend the Memorial Observation on March 23, 2016 because it "comes every year days before or the day of Easter Sunday," and he "was given authorization to use the van if needed." Doc. 71, p. 49. However, Mr. Scott provides no evidentiary support for either assertion—that there was no need to give notice for this particular religious event or that he was granted broad authorization to use his company vehicle to attend religious events. Such speculation as to the mindset of the Division Manager is insufficient to survive a motion for summary judgment. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1024 (8th Cir.2012) (explaining "'speculation and conjecture are insufficient to defeat summary judgment'") (quoting *Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir.2006)); *Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir. 2001) ("It is [w]hen the record contains no proof beyond speculation to support the verdict, [that] judgment as a matter of law is appropriate.") (internal quotations omitted).

Because Mr. Scott has provided no evidence beyond speculation to support an inference of religious discrimination, Cowley is entitled to summary judgment as to Count IV.

### 3.    Count III: Denial of Promotional Opportunities Based on Race

To establish a prima facie case of race discrimination based on a failure to promote, Mr. Scott "must show that (1) [he] is a member of a protected group; (2) [he] was qualified and applied for a promotion to an available position; (3) [he] was rejected; and (4) similarly situated employees, not part of the protected group, were promoted instead." *Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir. 1996). If he establishes a prima facie case, then under the *McDonnell Douglas* framework, "the burden of production shifts to [Cowley], who must rebut the presumption of

discrimination with evidence 'that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason.'" *Allen v. Tobacco Superstore, Inc.*, 475 F.3d 931, 937 (8th Cir. 2007) (quoting *Shannon*, 72 F.3d at 682). If Cowley satisfies its burden, Mr. Scott may yet prevail by presenting evidence that Cowley's "stated reasons are pretextual." *Id.*

Mr. Scott identifies only one job opportunity that he alleges he was denied based on his race—a part-time payroll manager position that became available in November 2013 at Cowley's main headquarters in Jefferson City, Missouri. Mr. Scott admits that he never applied for the position. Doc. 71, p. 15. However, he argues that he never applied for the position because he was unaware that the opportunity existed, and had he been made aware he would have applied.

Generally, a plaintiff's failure to formally apply for a position precludes the ability to establish a prima facie case of failure to promote. Under certain circumstances, however, a plaintiff's failure to apply for will not bar him from establishing a prima facie claim. The Eighth Circuit has held that a plaintiff's failure to apply may be excused if the employer had "some reason or duty to consider him for the post," *Green v. City of St. Louis, Mo.*, 507 F.3d 662, 667 (8th Cir. 2007) (quoting *Kehoe v. Anheuser–Busch, Inc.*, 96 F.3d 1095, 1105 n. 13 (8th Cir. 1996)), or

> the job opening was not officially posted or advertised and either (1) the plaintiff had no knowledge of the job from other sources until it was filled, or (2) the employer was aware of the plaintiff's interest in the job notwithstanding the plaintiff's failure to make a formal application.

*Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1217 (8th Cir. 1990); *see also Allen*, 475 F.3d at 937 ("Failure to formally apply . . . does not bar a plaintiff from establishing a prima facie claim, as long as the plaintiff 'made every reasonable attempt to convey [his] interest in the job to the employer."). Here, neither exception applies.

The *Green* exception does not apply because there is no evidence, or even any argument, that Cowley had any duty to consider Mr. Scott for the part-time payroll manager position at its

Jefferson City office. The *Chambers* exception does not apply because it is undisputed that Cowley officially posted the position. Indeed, it is Mr. Scott who presents the official notice that was posted at Cowley's Jefferson City office between November 4, 2013 and December 2, 2013. Doc. 71-7, p. 18.

Mr. Scott argues, without citation to any authority, that Cowley should have posted the job opening in all offices, not just Jefferson City. Even if such a proposition were true, Mr. Scott's claim still fails because Cowley offers a legitimate, non-discriminatory reason for its actions. It is undisputed that Cowley's practice is to post jobs at the regional level because hiring is done at the regional level, and because in Cowley's experience, employees are unwilling to relocate themselves or their families to a new location for a job in a different regional office. Doc. 71, p. 15. Indeed, such rationale is especially relevant in this case, as the payroll manager job was only a part-time position. Mr. Scott would have had to leave his full time job in Lenexa, Kansas, to take the part-time job in Jefferson City, Missouri. Therefore, there is nothing discriminatory in Cowley's practice with regard to job postings.

Cowley also offers a legitimate, non-discriminatory reason as to why it preferred someone else for the position. The candidate who received the position was already a full-time employee at the Jefferson City office, and therefore he was able to take on the duties of payroll manager in addition to his normal duties. The candidate was also more qualified than Mr. Scott. Whereas Mr. Scott has only a bachelor's degree in criminal justice, a certificate in business/computer programming, and has never worked in any position requiring business or accounting skills, the candidate who received the position has a bachelor's degree in business administration with a focus in accounting, and had worked in Cowley's Accounts Receivable department for two years prior to assuming the part-time payroll manager duties in addition to his other duties. Doc. 71, p. 15;

Doc. 70-7, p. 3.

Mr. Scott offers no evidence to suggest that Defendant's proffered legitimate, non-discriminatory reasons for its hiring decision are merely pretextual. Therefore, his failure to promote claim fails, and summary judgment is granted for Cowley on Count III.

**B.**     **Count II: Hostile Work Environment**

To state a claim for hostile work environment by non-supervisory co-workers, under either Title VII or § 1981, Mr. Scott must establish:

> (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and his membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999) (analyzing claims under Title VII); *see also Clay v. Credit Bureau Enterprises, Inc.*, 754 F.3d 535, 540 (8th Cir. 2014) (analyzing claim under § 1981).

Mr. Scott bases his hostile work environment claim on three events: the zip-tie securing his GPS to his company vehicle, racially insensitive social media posts made by other Cowley employees, and racially insensitive jokes made at work by other Cowley employees. Cowley argues primarily that none of these events affected a term, condition, or privilege of Mr. Scott's employment.

For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Clay*, 754 F.3d at 540 (quoting *Malone v. Ameren UE*, 646 F.3d 512, 516 (8th Cir.2011). Analysis of this element includes both an objective and subjective component. *Id.* To determine whether a work environment is objectively offensive, the Court

must examine all the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Id.* (quoting *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892–93 (8th Cir. 2005)). The complained of harassment must create "an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive." *Id.* (quoting *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002)). The conduct must be more than "merely offensive, immature or unprofessional . . . . [C]onduct that does not exceed that threshold of severity is insufficient to constitute a prima facie case." *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1027 (8th Cir. 2004). Here, none of the conduct Mr. Scott complains of rises to a level sufficient to support a prima facie case.

With regard to the zip-tie that secures Mr. Scott's GPS to his company vehicle, it is inescapable that no reasonable employee would perceive it as creating a hostile environment. The zip-tie bears no resemblance to a noose, as Mr. Scott alleges, and no reasonable person would look at a zip-tie and be reminded of a lynching. Mr. Scott's subjective perception of the plastic zip-tie alone cannot support a claim for a hostile work environment. *See Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010) (observing that "the hostile work environment must be both objectively and subjectively abusive").

With regard to the social media posts, there is no evidence to suggest that they were anything other than an isolated incident. While certainly inappropriate, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988). The posts do not rise to the level of "extremely serious," as Mr. Scott was not the target, and he did not learn of them

until over a year after they were made. Doc. 70-1, p. 36. Moreover, the employee who was responsible for the posts was promptly terminated. Doc. 70-3, p. 3.

Finally, Mr. Scott presents evidence of four inappropriate jokes made by a single co-worker, Gerald O'Guinn. Specifically, Mr. Scott refers to jokes or comments involving remarks about "Jim Crow;" a reference that a person suspected of murder had a dark complexion and looked like Mr. Scott; a joke that Mr. Scott was responsible for graffiti because it appeared to be a religious symbol; and an instance where Mr. Scott was cursed at for failing to write down his van's mileage. *See* Doc. 71-7, p. 27. Mr. Scott's evidence of just four occurrences over a three year period is insufficient, as a matter of law, to support a hostile workplace claim. The jokes are infrequent, merely offensive as opposed to threatening, and did not interfere with Mr. Scott's work performance. *See Clay*, 754 F.3d at 540 (stating that the Court must examine "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance"); *Henthorn*, 359 F.3d at 1027 (explaining that "[c]onduct 'must be extreme and not merely rude or unpleasant' before it can be said to have, in an objective sense, affected the terms and conditions of employment").

Therefore, Mr. Scott's hostile work environment claim fails as a matter of law.

## C.    Count V: Retaliation

Plaintiff brings his retaliation claim under both Title VII and § 1981. The distinction is insignificant, however, as courts "'apply the same analysis' to § 1981 retaliation claims and to retaliation claims under Title VII." *Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1030 (8th Cir. 2013). To establish a prima facie case of retaliation, Plaintiff must demonstrate "(1) that he engaged in statutorily protected activity; (2) an adverse employment action was taken against him;

and (3) a causal connection exists between the two events." *Id.* (quoting *Gilooly v. Mo. Dep't of Health and Senior Servs.*, 421 F.3d 734, 739 (8th Cir. 2005)); *see also Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007) (explaining that to establish a prima facie case of retaliation under Title VII, "Plaintiffs must show (1) they engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct.").

It is undisputed that Mr. Scott engaged in protected conduct by complaining about racial discrimination to his supervisors and management, and also by filing an EEOC charge. As discussed above, Mr. Scott also suffered an adverse employment action when Cowley issued him four write-ups. Mr. Scott's claim fails, however, because he offers no evidence of any causal connection between his complaints of racial discrimination and the write-ups that he received.

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). Therefore, Mr. Scott must establish that his complaints of racial discrimination were a "determinative—not merely motivating—factor" in the decision to issue his write-ups. *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008) (quoting *Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1050 (8th Cir. 2007)). Yet, Mr. Scott offers no evidence of any causation, and presumably relies only on the timing of his write-ups.

Generally, "more than a temporal connection is required to present a genuine factual issue on retaliation . . . , and only in cases where the temporary proximity is very close can the plaintiff rest on it exclusively." *Tyler v. Univ. of Arkansas Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) (internal quotations omitted). As time passes between the plaintiff's conduct and the employer's act, "the inference of retaliation becomes weaker and requires stronger alternative

evidence of causation." *Id.* (quoting *Sims v. Sauer–Sundstrand Co.*, 130 F.3d 341, 343 (8th Cir. 1997)). The Eighth Circuit has stated that "[t]he inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." *Id.* The Eighth Circuit has also previously held that "a two-week interval was 'sufficient, but barely so.'" *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006) (quoting *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 833 (8th Cir. 2002).

Here, the time between Mr. Scott's protected conduct and the write-ups that he received is too great to, by itself, show causation for purposes of establishing his retaliation claim. Mr. Scott's EEOC charge was filed in 2009, and yet he did not receive a write-up until 2016. Therefore, it is indisputable that the EEOC charge cannot serve as the basis of a retaliation claim. Mr. Scott also presents evidence of six letters that he wrote to Cowley's CEO and President, John Cowley. The first letter was written in 2009, and as with the EEOC charge, cannot serve as the basis. Mr. Scott also wrote letters to Mr. Cowley on May 6, 2016, June 13, 2016, August 31, 2016, November 17, 2017, and January 12, 2018, which thus occurred after Mr. Scott received his first write-up. Three of the letters also occurred more than a year before Mr. Scott received his next three write-ups, in July and October 2017, and then Mr. Scott's final two letters occurred after all of the write-ups had already been issued. Therefore, the time between Mr. Scott's complaints to Cowley about racism and when he received four write-ups is too long, as a matter of law, to establish a causal connection that supports his retaliation claim.

As Mr. Scott presents no other evidence of a causal connection, the Court grants summary judgment in favor of Cowley on Count V.

D.    <u>**Motion for Leave to File Sur-Reply**</u>

On July 30, 2018, Mr. Scott filed a motion for leave to file a sur-reply brief, contending

that Cowley raised new arguments in its reply brief for the first time. Specifically, Mr. Scott maintains that Cowley raised new arguments related to the admissibility of his exhibits, the form of his opposition brief, and other factual disputes. After careful review of the briefing, the Court finds that Cowley did not raise any arguments in its reply brief that were not either contained in its initial brief, or raised by Mr. Scott in his opposition. Furthermore, to the extent that Mr. Scott requests an opportunity to argue the admissibility of his exhibits, the Court finds it to be unnecessary. The Court has ruled on Cowley's motion for summary judgment without striking any exhibits.

## III.   <u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motion for Summary Judgment, Doc. 69, is granted as to Counts II, III, IV, and V. The motion is denied as to Count I. Plaintiff's Motion for Leave to File a Sur-Reply is denied.


<u>/s/ Nanette K. Laughrey</u>
NANETTE K. LAUGHREY
United States District Judge

Dated:  <u>August 20, 2018</u>
Jefferson City, Missouri